**MAINE PUBLIC SERVICE COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

No. 77–1438.

United States Court of Appeals, First Circuit.

Argued March 7, 1978.

Decided June 26, 1978.

Leon A. Allen, Jr., Washington, D. C., with whom Roger A. Putnam, Portland, Maine, David R. Poe, LeBoeuf, Lamb, Leiby & MacRae, New York City, and Verrill & Dana, Portland, Maine, were on brief, for petitioner.

John J. Lahey, Atty., Washington, D. C., with whom Robert R. Nordhaus, Gen. Counsel, and Howard E. Shapiro, Sol., Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Maine Public Service Company (MPSC), an electric utility, petitions for review of

Federal Power Commission [1] orders denying it permission to retain a surcharge collected from its wholesale customers in 1975–76. The object of the surcharge was to recover fuel costs which were not collectable by operation of the fuel adjustment clause that forms part of MPSC's rate schedules.[2]

At the root of the present dispute is the rapid increase in fuel prices which took place in the mid-1970's causing MPSC to shift in 1975 from one fuel adjustment clause to another. Under the earlier formula, customers had been billed monthly on the basis of fuel prices averaged over a previous twelve-month period. Given the upward surge of prices, this formula resulted in mounting losses to the utility, which, because of the time lag, was obliged to bill its customers on the basis of price data that was unrealistically low by the time each successive bill was computed. To avert this problem MPSC finally adopted a new fuel adjustment formula calling for billings based on the price of fuel just one month prior to the billing month. By requiring reimbursement based on prices closer in time to the billing date, and hence more nearly in tune with actual costs at that moment, the utility could obtain from its customers more nearly what was needed to offset the current cost of fuel. But while adoption of the new formula in 1975 enabled the utility to keep from going deeper in the hole (assuming continued price increases), it provided no means to recoup the unbilled fuel costs which had been permitted to build up while the old clause was in effect: indeed, switching to the new formula and thus interrupting the operation of the old can be said, in a sense, to have "frozen" the collection of the unbilled costs which by then amounted to nearly half a million dollars, a sum equal to one-fifth of MPSC's annual revenues.

MPSC's attempted answer to the problem was to impose upon its wholesale customers [3] for a twelve-month period in 1975–76 the surcharge presently in dispute—this being in addition to regular fuel adjustment charges computed under the new formula. The surcharge was calculated so as to recover the sum total of the previously uncollected charges. Intended to be spread among the various customers' bills during the twelve months, the surcharge was placed on file with the Commission as part of MPSC's rate schedule.

The Commission permitted MPSC to collect the surcharge provisionally. But it ordered a hearing to review the legality of the surcharge and eventually disapproved it, ordering MPSC to make a full refund to its customers. We are now asked to review the correctness of that administrative decision.

In the Commission's view, the build-up of unbilled fuel costs had been due simply to misjudgment by MPSC, which was free to have adopted a more satisfactory fuel adjustment formula than it did in the period prior to 1975. The Commission sees the surcharge as impermissible "reparations" for the consequences of an ill-considered rate formula.

MPSC, on the other hand, likens the old fuel clause to a deferred billing system which was simply too slow to cope with the rapidly rising, inflationary market. As under the old clause MPSC would over time have recovered all or most of the fuel costs attributable to the relevant periods (whatever cash flow problems it might experience

1. Authority to review Commission orders is conferred by 16 U.S.C. § 825*l*(b).

 Under the Department of Energy Organization Act, 42 U.S.C. §§ 7101 *et seq.*, the Federal Power Commission was replaced in 1977 by the Federal Energy Regulatory Commission. Under the Act, the new Commission adopts all ongoing proceedings in which the Power Commission was a party. *See* 42 U.S.C. § 7172(a).

2. A fuel cost adjustment clause is a formula, filed with the Commission in addition to a utility's ordinary tariff, under which the utility modifies the rate it ultimately charges its customers for energy in fixed relation to its own changing expenditures for the fuel used to generate the energy furnished. *See infra; see also* 18 C.F.R. § 35.14 (1974).

3. The term "wholesale" customers refers to MPSC customers who purchase electricity for resale; "retail" customers, *see* page 4, *infra*, refers to those who purchase electricity for their own consumption.

in the meantime), its customers should not—so MPSC argues—receive the windfall of never having to pay the full actual costs of fuel. Thus MPSC views the surcharge as an equitable device to bridge the earlier and later formulae, and permit it to catch up in its billings.

I

While the foregoing suggests the essence of the dispute, amplification of the facts is in order. Until 1972, MPSC furnished electricity to Maine retailers under rates regulated by the Maine Public Utility Commission. Because of a new ownership interest, MPSC in late December 1972 became subject to Commission regulation, see 16 U.S.C. §§ 824a(f), 824b. Accordingly, on June 6, 1973, MPSC tendered for filing its wholesale rate schedule, Rate 0–1, to the Commission. Rate 0–1 included a fuel cost adjustment clause, see supra, by which MPSC undertook to adjust the fuel charge comprised in its base rate to reflect cost fluctuations in its own purchases of fuel and energy.[4] The adjustment was to be made, in essence, by (1) calculating the difference between fuel costs actually incurred over a given one-year period, and the fuel costs covered by the base rate over the same one-year period; (2) dividing that cost differential by the total number of kilowatt hours sold by MPSC during that year, to give a figure representing MPSC's increased fuel expenditure per kilowatt hour sold in that year; and (3) applying the adjustment figure in cents per kilowatt hour, as determined in step (2), to the number of kilowatt hours used by the customer in the billing month. The product would then be added to the customer's base rate to find the amount due. The one-year period relied on in step (1) would "roll" forward as the billing month changed: the formula called for price data from the twelve

months ending with the second month preceding the billing month.[5] Thus, the cost increases borne by MPSC over the year preceding the billing month would gradually be reflected in the customer's bill.

MPSC explains that this "twelve month rolling average" method

"operated to stretch out the recovery of a particular month's fuel costs over a period of a year, with the final portion of recovery being some fourteen months after the costs were actually incurred. In times of relatively stable fuel prices, the twelve-month rolling average tends to damp out seasonal variations in the price of fuel. In times of sharply rising fuel prices, however, this method causes a tremendous buildup of unbilled fuel costs which cannot be fully recovered unless fuel prices fall."

In this case, prices rose sharply in the wake of the Arab oil embargo, and did not recede thereafter. MPSC was stranded, consistently paying out more for fuel than it was receiving for fuel from its customers. Despite its predicament, MPSC continued use of its twelve-month rolling average until March 15, 1975, when it finally proposed a different method of calculating a fuel cost adjustment. Prior to the filing of the new clause, the Commission and MPSC engaged in correspondence concerning various other aspects of MPSC's twelve-month rolling average clause, a rulemaking on the general topic being then in progress.[6] MPSC has since claimed that the regulatory confusion which in this period surrounded the standards for fuel clauses generally was a factor which discouraged it from moving more rapidly to streamline its old clause.

The new fuel clause filed early in 1975 and still in effect differs significantly from the old. It offers increased sensitivity to the volatile fuel costs that MPSC must

---

**4.** The Commission found that about 36% of the energy used by MPSC was generated by MPSC itself; about 63% was purchased from the New Brunswick Electric Power Commission, in Canada; and 1% was purchased indirectly from New Brunswick through the Maine Electric Power Company.

**5.** The calculation was actually more complex, since MPSC's three distinct energy sources had to be handled separately, but the twelve-month rolling average principle was applied to each.

**6.** See 38 Fed.Reg. 17,253; see also 39 Fed.Reg. 40,583 (Order 517).

bear, since the clause operates on the basis of more current data. The new clause calculates the total energy costs for the month preceding the billing month, and divides that by the total sales in kilowatt hours for the month preceding the billing month, to give the actual energy costs per kilowatt hour for that month. It then takes the difference between that unit cost and the fuel cost reflected in the base rate, producing a cents per kilowatt hour figure representing the increase (or decrease) from the base rate for fuel that the Company has had to bear during the month preceding the billing month. That cents per kilowatt hour figure is then applied to the number of kilowatt hours used by the customer in the billing month to determine how much in addition to the base rate he must pay for the electricity used during that month. This method keeps the Company's revenues and expenditures in closer accord than did the twelve-month rolling average. Its institution also operated to "freeze" the ever-widening gap between revenues and operating costs that had caught MPSC in a serious cash-flow squeeze.

When the new fuel clause was proposed, the gap between revenues collected under the old clause and actual costs amounted to $456,647. One year and nine months had passed since MPSC's initial filing with the Commission. MPSC sought to bridge the gap by filing with its revised adjustment clause a surcharge under which MPSC would add to customers' bills twelve equal monthly installments of the customers' prorated portions of MPSC's unbilled expenditures. The Commission accepted the filing on May 5, 1975, and allowed the new clause and the surcharge to go into effect—subject to refund—on May 11, after a one-day suspension. MPSC collected the surcharge over the twelve months for which it was designed, and terminated its collections thereunder in May 1976.

After provisionally accepting the filing, the Commission instituted a proceeding un-

der section 205(e) of the Act, 16 U.S.C. § 824d(e), to determine the lawfulness of the surcharge and of an element of the adjustment clause whose invalidity is no longer contested by MPSC. On September 30, 1976, after a hearing in January of that year, an Administrative Law Judge (ALJ) issued an "Initial Decision" finding the surcharge and the element of the proposed fuel adjustment clause not just and reasonable under § 824d(b), but recommended rulemaking on the treatment of unrecovered costs represented by the proposed surcharge.

On March 21, 1977, the Commission issued its Opinion No. 790, in *Public Service Company of New Hampshire,* Docket No. ER 76–285, 19 PUR 4th 210, ruling that a surcharge proposed in similar, though not identical circumstances, *see infra,* was unlawful. On June 20, 1977, *Virginia Electric & Power Co.,* Docket No. ER 76–415, was summarily decided on a similar issue,[7] and on June 27, 1977, the Commission entered an "Order modifying initial decision and rejecting proposed fuel adjustment clause" in this case, which rejected MPSC's use of the surcharge. The Commission denied MPSC rehearing on August 25, 1977, and on October 5, 1977, MPSC filed its petition for review.

II

Since the arguments of the parties presuppose some understanding of the statutory scheme under which the Commission regulates the rates of electric utilities, we briefly describe that scheme. Congress has provided in 16 U.S.C. § 824d(a) that all rates and charges of electric utilities "shall be just and reasonable"; those that are not just and reasonable are declared "unlawful". *Id.* A utility need not, however, seek Commission approval before putting a given rate in effect. Rather the utility must simply maintain on file with the Commission a schedule showing all current rates

7. The Commission issued an order in Docket No. ER 76–415 denying Virginia Electric & Power's proposed fuel adjustment clause surcharge and reversing the Initial Decision of an Administrative Law Judge, issued October 12, 1976, granting the surcharge. The Commission's order is currently on appeal to the Fourth Circuit, Docket No. 77–2153.

and charges subject to Commission jurisdiction, and it may not change its filed rates and charges without advance notice to the Commission and public. § 824d(c). If the Commission, upon complaint or its own initiative, suspects that a rate or charge on file is improper, it is empowered to hold a hearing, § 824d(e), and when a rate increase is so challenged the utility has the burden of proving that the new rate is "just and reasonable." *Id.* The primary purpose of this mechanism is to protect consumers from excessive rates and charges—any protection received by a utility is incidental. *Municipal Light Boards v. FPC,* 146 U.S. App.D.C. 294, 201, 450 F.2d 1341, 1348, *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972); *see FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 355, 76 S.Ct. 368, 100 L.Ed. 388 (1956). Finally, if the Commission after hearing finds that any filed rate or charge is "unjust, unreasonable, unduly discriminatory or preferential," it may determine and fix the just and reasonable rate or charge "to be *thereafter* observed." § 824e(a). This language has been held to deny to the Commission any authority to invalidate retroactively rates later deemed unjust. *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 618, 64 S.Ct. 281, 88 L.Ed. 333 (1944). The statute has also been construed not to allow the Commission to award damages or "reparations" to injured parties for unreasonable past rates. *Id.; Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 254, 258, 260, 71 S.Ct. 692, 95 L.Ed. 912 (1951).[8]

It was in this regulatory context that the Commission ultimately invalidated MPSC's filed surcharge designed to recover fuel costs for which the Company had not been able to collect in the prior period under its previously filed fuel clause. The Commission in its opinion conceded that its fuel adjustment regulation, 18 C.F.R. § 35.14 (1974), permitted a utility to pass along

changes in the cost of fuel "without the necessity of a complete rate filing," *i. e.* the utility could file and adhere to a formula tied into the changing cost of fuel rather than being forced to calculate a flat rate in advance estimated to allow for future fuel costs. But the Commission went on to say that in sanctioning this device, it never contemplated "penny for penny recovery" nor did it intend to relieve the utility from "all risks of doing business." In the Commission's view, MPSC's surcharge violated "the filed rate doctrine," which the agency equated with language in *Montana-Dakota, supra* at 251, 71 S.Ct. 692, that no rate can be claimed "as a legal right that is other than the filed rate." The Commission reasoned,

> "When Maine filed its new fuel adjustment clause the old fuel clause was superseded and rates must now be calculated in accordance with the new fuel adjustment clause, which is now the filed rate."

The Commission bolstered its refusal to approve the surcharge by reliance upon its recent decision in *Public Service Company of ,New Hampshire, supra,* which it held to be a controlling precedent. In that decision, also involving a surcharge intended to close the gap between prior and later fuel clauses, the Commission likewise cited *Montana-Dakota* and went on to discuss in greater detail than here its reasons for rejecting such a surcharge.[9]

MPSC thereafter unsuccessfully sought rehearing, arguing that the Commission misread *Montana-Dakota* and the filed rate doctrine, and failed to recognize that MPSC's situation differed significantly from that of the New Hampshire utility in Opinion No. 790. In denying rehearing, the Commission stated,

> "The Company recovered all that it was entitled to recover under the filed

---

**8.** By accepting MPSC's surcharge only provisionally, the Commission here preserved its right to order a refund should it disallow the surcharge after hearing.

**9.** The New Hampshire and Virginia cases show that the general problem under review here is

not an isolated one, and that the Commission, following an adjudicatory rather than rulemaking approach, has steadfastly refused to allow companies adopting new fuel clauses with a shorter time lag to "catch up" through the medium of a surcharge.

rate. The fact that Maine's prior fuel adjustment clause did not adequately compensate it for its costs, due to a self imposed lag in recovery built into the filed rate, does not permit this Commission to retroactively increase that rate.[3]

"[3] *F. P. C. v. Hope Natural Gas Company,* 320 U.S. 591, 618 [64 S.Ct. 281, 88 L.Ed. 333] (1944), *State Corporation Commission of Kansas v. F. P. C.,* 215 F.2d 176, 184 (8th Cir. 1954).

Contrary to Maine's arguments, the Commission is not taking the position that it is a violation of the filed rate doctrine for a company to collect for other than current costs. The fuel adjustment clause constituted part of the filed rate for the period during which it was in effect and the utility, 'can claim no rate as a legal right that is other than the filed rate.[4]

"[4] *Montana Dakota Utilities Co. v. Northwestern Public Service Company,* 341 U.S. 246, 251 [71 S.Ct. 692, 95 L.Ed. 912] (1951)."

Maine was free to file a rate change that would shorten the lag in the collection of fuel costs at the time when it became apparent that its existing fuel adjustment clause was inadequate. Instead, it chose to exercise this option after the buildup of a substantial amount of assertedly unrecovered cost. However, since Maine's consumers paid the rates assessed according to the rate on file, Maine cannot now recover that shortfall through the imposition of a surcharge in excess of its filed rate.

The Commission also rejected MPSC's contention that Opinion No. 790 was not a valid precedent.

On appeal, much the same issues are raised, although with some elaboration and additions. Our view is, of course, limited by the deference we must pay to the Commission's expertise when carrying on the rate-making function assigned to it by Congress, *see Pennsylvania Water & Power Co. v. FPC,* 89 U.S.App.D.C. 235, 246–48, 193 F.2d 230, 241–43 (1951), *aff'd,* 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042 (1952); *cf. Mobil*

*Oil Corp. v. FPC,* 417 U.S. 283, 306–10, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974); *Permian Basin Area Rate Cases,* 390 U.S. 747, 766–67, 791–92, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

### III

#### a. *The filed rate doctrine*

 We agree with MPSC that the Commission is on shaky ground when it argues that Supreme Court precedent in the *Montana-Dakota Utilities Co.* case, *supra,* (which the Commission styles the "filed rate doctrine") forecloses a surcharge of this character. The interpretation of judicial precedent is a subject upon which this court may pass judgment independently of the Commission's views. *FPC v. Pacific Power & Light Co.,* 307 U.S. 156, 160, 59 S.Ct. 766, 83 L.Ed. 1180 (1939);[10] *see Stockman v. John T. Clark & Son of Boston, Inc.,* 539 F.2d 264, 269–70 (1st Cir. 1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1092 (1977); 5 U.S.C. § 706.

In *Montana-Dakota,* one utility sued another charging that during an earlier period when the two utilities shared many directors and managers, the defendant utility had defrauded it by setting improper rates for electric power interchanged between the two companies. The central issue before the Supreme Court concerned the authority of a federal district court to set aside and reassess rates which had been filed with the Commission, upon its own determination that the rates were not "just and reasonable," and were hence "unlawful" under § 824d(a). Holding that Congress had left to the Commission alone the determination of what constituted a reasonable rate, the Supreme Court enunciated the "filed rate" principle which the Commission seeks to apply in the present, different situation. The Court said,

"[Montana-Dakota] cannot litigate in a judicial forum its general right to a reasonable rate, ignoring the qualification

**10.** Agency interpretation of judicial precedent stands on a different footing from agency interpretation of its own enabling statute. In the latter case we often give special weight to the

agency's construction. *Silva v. East Providence Housing Authority,* 565 F.2d 1217, 1218 (1st Cir. 1977).

that it shall be made specific only by exercise of the Commission's judgment, in which there is some considerable element of discretion. It can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms.

"We hold that the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one."

341 U.S. at 251–52, 71 S.Ct. at 695. Concluding that Montana-Dakota was without a judicial remedy under the Federal Power Act, and observing that even the Commission lacks power to grant reparations for past unlawful rates, *id.* at 254, 71 S.Ct. 692, the Court affirmed the court of appeals' reversal on the ground that Montana-Dakota had failed to establish a cause of action cognizable in the district court.

 We read this case as authority for the principle that a rate filed with the Commission has the force of law, and cannot be challenged in the courts for unreasonableness except upon direct review of the Commission's endorsement of the rate: collateral attack is foreclosed. A court is bound to defer to the Commission's primary jurisdiction in the matter of rates, and utilities are prohibited from demanding and collecting rates other than those filed with the Commission. *See City of Cleveland v. FPC*, 174 U.S.App.D.C. 1, 525 F.2d 845 (1976); *Cities Service Gas Co. v. FPC*, 424 F.2d 411 (10th Cir. 1969), *cert. dismissed*, 400 U.S. 801, 91 S.Ct. 9, 27 L.Ed.2d 33 (1971). *See also Phillips Petroleum Co. v. Ashland Oil & Refining Co.*, 40 F.P.C. 390, 393 (1968); *Trunkline Gas Co. v. The Superior Oil Co.*, 34 F.P.C. 1284, 1285 (1965), *aff'd*, 35 F.P.C. 335 (1966); *Durbin Bond & Co., Inc.*, 25 F.P.C. 753, 754 (1961).

In attempting to apply *Montana-Dakota* to the present situation, the Commission argues that the "filed rate" for the period when fuel costs were rising sharply was the fuel clause with the twelve month rolling average formula. The new "filed rate" is the one-month lag formula. MPSC is said to be entitled only to what it could collect under the filed rate in effect for the earlier period. A surcharge—no matter how related to or part of the earlier formula, no matter if filed with the Commission, or integrated into the new fuel cost adjustment charge—cannot, the Commission argues, be collected concurrently with the new fuel adjustment charge:

"[I]t was the tariff on file, with its new provision for recovery of each month's costs the immediately succeeding month, that the Commission considered in processing the request for the surcharge. Because this new tariff contained no provision for recovery of fuel costs on a twelve month average basis, providing instead for recovery on a monthly basis, the Commission was proscribed from allowing any other rate. *Montana-Dakota, supra.*"

Whatever the soundness of this approach as a matter of regulatory policy, it goes well beyond anything decided in *Montana-Dakota*. The Commission refers us to no other authority than its own recent Opinion No. 790 in the New Hampshire case, which is now on appeal (D.C. Cir. No. 77–1592), in support of its expansive reading of that case. The filed rate doctrine enunciated in *Montana-Dakota* is addressed to a court's power to reassess the reasonableness of a rate filed with the Commission and collected under that authority. It also controls disputes among utilities and their customers as to what rate may lawfully be collected. Here, if the Commission chose to accept for filing MPSC's proposed surcharge, MPSC could lawfully collect the surcharge. The charge would appear on the tariff; its terms would be settled by the tariff; the utility could collect no more than provided for by the surcharge; the customer's liability would be determined by the surcharge. A court could not reexamine the validity of the surcharge independent of a statutory

proceeding to review the Commission's determination of the lawfulness of the surcharge under § 824d(b). The holding in *Montana-Dakota* reaches no farther. "The considerations underlying the doctrine . . . are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant." *City of Cleveland v. FPC, supra,* 174 U.S.App.D.C. at 10, 525 F.2d at 854; *see Cities Service Gas Co. v. FPC, supra,* 424 F.2d at 417. Neither of these considerations requires the Commission to disallow MPSC's surcharge: the Commission would not otherwise abandon its supervisory role over the reasonableness of the surcharge, nor would MPSC acquire the power to assess a charge unknown to the agency.

b. *Retroactive Rate-making*

■ The Commission is closer to the mark insofar as it invokes the principle forbidding "retroactive rate-making." This concept is more germane than the filed rate doctrine to the question before us, namely, to the limitations that exist on the type of rates and charges the Commission may approve. As we have seen, the Commission itself lacks power to order "reparations" in compensation even for unjust or unreasonable past rates. *FPC v. Hope Natural Gas Co., supra,* 320 U.S. at 618, 64 S.Ct. 281; *FPC v. Sierra Pacific Power Co., supra;* 16 U.S.C. § 824e. This limitation contrasts with the authority of the Interstate Commerce Commission, for example, to award such damages. 49 U.S.C. §§ 15(7), 16(1); *see News Syndicate Co. v. New York Central Ry. Co.,* 275 U.S. 179, 187, 48 S.Ct. 39, 72 L.Ed. 225 (1927); *Sec'y of Agriculture v. ICC,* 179 U.S.App.D.C. 370, 551 F.2d 1329 (1977). There is also said to be a general rule that "neither past profits nor past losses may be considered in determining reasonable rates for electricity; . . . [the utility] is not entitled to charge more than reasonable rates in order to recoup or amor-

tize past losses." 29 C.J.S. Electricity § 34 at 1047 (1965) [Footnotes omitted].

But while those notions are more relevant than the decision in *Montana-Dakota,* they are not by themselves dispositive. The surcharge here in dispute is not strictly a reparation award. The Commission has not been asked to award damages; the surcharge was imposed by the utility. Nor is it so obvious that the surcharge seeks only to recoup past losses. To be sure it can be argued, as does the Commission, that the surcharge is merely a belated attempt to collect in a later year sums that were overlooked by the earlier fuel clause. But it can also be argued with some force that the prior fuel formula anticipated that customers would eventually have to pay the very sum which the surcharge has now assessed in a different form. Arguably MPSC's customers were put on notice by the original fuel clause that, in due course, they would be held accountable for fuel costs at current prices. On that premise, it may be contended that the past formula did not set a rate that was too low. The trouble was perhaps more one of deferred collection, a question of timing, which MPSC might be allowed to repair after the upset caused by discontinuance of the old clause and introduction of the new. The surcharge can be likened to continued operation of the old clause until the expenses accruing thereunder have been billed to, and paid by, MPSC's customers. To be sure, the twelve-month rolling average system did not assure that MPSC would precisely match all its expenditures.[11] However, the mechanism of the earlier fuel cost adjustment clause would eventually have passed on the rising fuel costs temporarily funded by the utility. In this regard MPSC's clause, whatever its practical deficiencies during a period of rising prices, was arguably in keeping with the policy announced by the Commission in Order 517, pertaining to fuel clauses generally, "to make utilities whole," and the surcharge

11. This is so because the average cost figures were applied to the kilowatt hours consumed in a month for which the costs had not yet been

determined. *See New England Power Co.,* 48 F.P.C. 899, 908–09 (1972).

can now be defended as simply implementing the same policy.[12]

In the same vein, defenders of the surcharge can point to the fact that the Commission regulation, 18 C.F.R. § 35.14(a)(10) (1974), allows that deviation from the prescribed operation of fuel cost adjustment clauses may be allowed for good cause shown "whenever particular circumstances prevent the use of the standards provided for herein, or the use thereof would result in an undue burden." Also, the Commission in some circumstances has permitted a type of refund [13] outside of the ordinary rate-suspension context. Further, not allowing MPSC to retain the surcharge, and requiring it to bear the loss itself might result in the loss being passed on indirectly through the base rate to the present wholesale customers of MPSC and in turn to their retail customers, who bear even less chance of identity with those who used the electricity generated by the fuel than do the customers who provisionally paid the surcharge in 1976.

■ Considerations such as the foregoing lead us to conclude that the validity of the surcharge presents a unique policy question for the Commission rather than a black or white legal issue. The surcharge falls somewhere between a species of the forbidden "retroactive rate-making" and an acceptable adaptation of the earlier fuel clause to special conditions. Compare Initial Decision, *Virginia Electric & Power Co.*, *supra* note 6. The difficulty in classification stems not only from the inflationary rise in fuel costs that triggered the problem, but from the fact that fuel cost adjustment clauses are themselves unique animals that are not easily assimilated to classical rate-making principles. We believe that the Commission erred insofar as it regarded

itself as automatically precluded by prior judicial decisions such as *Montana-Dakota* or *Hope Natural Gas* from approving the surcharge. Those cases involve very different questions and facts. We do not say that the Commission could not find that a surcharge such as this was inequitable to customers or undesirable for policy reasons, but we think the Commission was simplistic insofar as it rejected the surcharge on the ground that its hands were tied by judicial precedent.

## IV

■ In stating some of the arguments supporting the surcharge, we do not mean to indicate that the Commission necessarily lacked authority and grounds to disapprove it. To the contrary, the Commission has primary jurisdiction in this area; it must put the welfare of consumers first and it may discern reasons to hold that a surcharge of this type, involving a delayed assessment of fuel cost liabilities between utility and customer, is unreasonable from the rate-payers' viewpoint. Compare *NAACP v. FPC*, 425 U.S. 662, 669–70 & n.5, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976); *FPC v. Sierra Pacific Power Co.*, *supra*, 350 U.S. at 355, 76 S.Ct. 368. Although many state regulatory commissions have, we are told, accepted surcharges in like circumstances, we are not convinced by MPSC that it has a claim of right to Commission approval of the surcharge. Rather, the matter presents a close issue of rate-making policy which Congress expected the Commission, not the courts, to resolve: the ultimate source of an answer must lie in the Commission's own expert appraisal of whether such a surcharge is "just and reasonable."

■ We miss, however, in the Commission's present decision sufficient focus upon

**12.** See 39 Fed. Reg. 40,582–83; *see also* Initial Decision, *Virginia Electric & Power Co.*, *supra* note 6.

**13.** See *Indiana & Michigan Electric Co. v. FPC*, 163 U.S.App.D.C. 334, 341–46, 502 F.2d 336, 343–48 (1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975). Also, the Commission does allow in other circumstances for "after the fact matching of actual costs and revenues," *Public Service Co. of New Hampshire*, Opinion No. 790, 19 PUR 4th 210, —

(1977), through "purchased gas cost adjustment provisions" that it makes available to pipelines. Though these adjustment provisions differ from fuel cost adjustment clauses in several respects, their retrospective nature is similar to that of the adjustment clause, and their existence indicates that the Commission may not be so devoid of the power to match past costs and present revenues as it here maintains.

this controlling statutory standard. There is not, although one might expect it, any · discussion of the effect of the surcharge on the reasonable expectations of wholesale and retail consumers, on the one hand, and the legitimate needs of the utility if it is to continue to serve the community efficiently, on the other. There is little reference to the issue of justness and fairness as between consumer and utility, or to the long-term interests of both. Nor are the retroactive features of the surcharge discussed in terms of the Commission's own regulatory policies or of the public interest. To the contrary a large part of the Commission's opinion can be construed as resting on a belief that court decisions have somehow deprived the Commission of the authority to face the underlying policy issue—that it is required, as a matter of black letter law, to

reject the surcharge whether or not in all the circumstances it is "just and reasonable." Indeed, the statutory words are not mentioned.

The Commission has more latitude in shaping a lawful rate than it has recognized. In mistakenly treating *Montana-Dakota* and other outside precedent as dispositive, the Commission has failed to perform its proper function—application of the statutory standard to the rates and charges in question. We therefore must remand the case to the Commission for its reconsideration.[14] *SEC v. Chenery Corp.,* 318 U.S. 80, 87–90, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (*Chenery I*); see *City of Huntingburg v. FPC,* 162 U.S.App.D.C. 236, 498 F.2d 778 (1974). Though the Commission may reach the same result as that we have now been called on to review, it may do so only on

---

**14.** We do not mean to suggest that, on remand, the Commission may approve or disapprove MPSC's surcharge only on the basis of factors relating uniquely to MPSC and its own customers. The Commission may properly take into account whether a surcharge such as this complies with the Commission's view of sound rate-making policy (and of course it may cite legal authorities to the extent applicable). The Commission is not limited to expressing policy determinations in a rule-making context. It has discretion to announce policies in an adjudicatory proceeding which may thereafter serve as a precedent. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–95, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (*Chenery II*); *NLRB v. Wentworth Institute,* 515 F.2d 550, 556 (1st Cir. 1975).

In the present case, MPSC has criticized the Commission for its reliance on Commission precedent in the New Hampshire case, Opinion No. 790, *supra,* which was decided shortly before this one. MPSC does not say that the Commission misread its own precedent, but rather that it failed to investigate and consider the facts that allegedly distinguish the MPSC from the New Hampshire surcharge. From what we know of the two cases, we think it was not necessarily wrong for the Commission to deal with the surcharge issue on the basis of precedent established in one of them. It might, indeed, be irrational for the Commission to deal differently with different companies in what many people might perceive as similar situations. *See Burinskas v. NLRB,* 123 U.S.App. D.C. 143, 147–48, 357 F.2d 822, 826–27 (1966); *NLRB v. Mall Tool Co.,* 119 F.2d 700, 702 (7th Cir. 1941). The Commission should not, of course, rely without explanation on precedent if the cases present materially different fact

situations, *see Michigan Wisconsin Pipe Line Co. v. FPC,* 171 U.S.App.D.C. 352, 357–58, 520 F.2d 84, 89–90 (1975), but it is not required to "make subordinate findings on every collateral contention advanced." *Minneapolis & St. Louis Ry. Co. v. United States,* 361 U.S. 173, 193–94, 80 S.Ct. 229, 241, 4 L.Ed.2d 223 (1959).

We cannot, however, affirm the Commission's present decision on the basis of its reliance on the New Hampshire case. While the opinion in that case is more expansive, it suffers from the same reliance on *Montana-Dakota* which infects the present decision. When severed from the erroneous legal analysis, what ancillary inquiry the Commission made of the justness and reasonableness of the New Hampshire surcharge does not provide sufficient support for the New Hampshire decision for the Commission to rely on it here as sole support for the conclusion that MPSC's surcharge is also unlawful. As the Supreme Court has said in a similar context, "The Commission's action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act. There must be such a responsible finding. . . . *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) (*Chenery I*) (The Commission's decision to reverse the ALJ's Initial Decision in *Virginia Electric & Power Co., supra* note 6, also reflecting disapproval of surcharges of this type was effected summarily, according to the docket sheet. We thus cannot discern its exact import, but assume that the analysis was similar to that in the New Hampshire case and this one).

correct application of the legal principles; we are not at liberty to affirm its order when the Commission's analysis rests on untenable legal grounds. *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (*Chenery II*); *Chenery I, supra*; *Mississippi River Fuel Corp. v. FPC,* 82 U.S.App.D.C. 208, 163 F.2d 433, 439 (1947); *see Gulf States Utilities Co. v. FPC,* 411 U.S. 747, 763–64, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); *Kurzon v. U. S. Postal Service,* 539 F.2d 788, 792–93 (1st Cir. 1976).

Because of our disposition of the case, we find it unnecessary further to consider the merits of MPSC's procedural claims.

In remanding to the Commission we also vacate the Commission's final order which included, *inter alia,* the requirement that MPSC make an immediate refund of amounts collected from its customers pursuant to the surcharge. As MPSC is, at least for the time being, relieved of the refund requirement, we dissolve the temporary stay order of April 25, 1978, which was entered relative to the refund requirement during the pendency of this appeal.

*Petition for review granted. The Commission's order is vacated and the case remanded for further proceedings. The temporary stay is dissolved.*