INDIANA AND MICHIGAN MUNICI-
PAL DISTRIBUTORS ASSOCIA-
TION, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Indiana & Michigan Electric
Co., Intervenor.

CITY OF ANDERSON, INDIANA and
City of Auburn, Indiana, Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Indiana & Michigan Electric Co., Indiana
& Michigan Municipal Distributors
Ass'n, Intervenors.

Nos. 80-1749, 80-1763.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 18, 1981.

Decided July 14, 1981.

As Amended July 29, 1981.

**1194**

George E. Morrow, Memphis, Tenn., with whom Thomas R. Ewald, Washington, D. C., was on the brief, for Indiana & Michigan Municipal Distributors Ass'n, petitioner in No. 80–1749 and intervenor in No. 80–1763.

James D. Pembroke, Washington, D. C., with whom Wallace L. Duncan, Washington, D. C., was on the brief, for City of Anderson, Indiana, et al., petitioners in No. 80–1763.

Joshua Z. Rokach, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Jerome Nelson, Acting Gen. Counsel, Federal Energy Regulatory Commission, Washington, D. C., was on the brief, for respondent.

Peter J. Schlesinger, New York City, for intervenor Indiana & Michigan Elec. Co.

Before TAMM and WILKEY, Circuit Judges, and HOMER THORNBERRY,* Senior Circuit Judge for the Fifth Circuit.

Opinion for the court filed by Senior Circuit Judge THORNBERRY.

---

THORNBERRY, Senior Circuit Judge:

On May 28, 1976, the Indiana and Michigan Electric Company (I&M) submitted increased rate schedules to the Commission [1] pursuant to section 205(d) of the Federal Power Act, 16 U.S.C. § 824d(d). In particular, and of sole relevance to this appeal, I&M sought to increase its rate schedule governing sales to municipal wholesale customers.[2] The Commission, after briefly suspending the increase, permitted it to take effect, subject to refund,[3] on July 23, 1976.[4] The administrative law judge then took the matter under consideration and determined that a modest portion of the increase was unwarranted and a concomitant refund thus in order. The Commission affirmed this result, but altered several of the judge's subsidiary conclusions.[5]

Upon denial of rehearing,[6] I&M's municipal customers brought this appeal, alleging that the approved reduced rate remained "unjust and unreasonable." Petitioners specifically charge that the Commission erred (1) in accepting a twelve percent return on equity figure in the computation of I&M's cost of purchasing power from its wholly-owned subsidiary, (2) in declining to revise I&M's test-year revenues from short-term sales in light of the substantial disparity between the test-year estimate and the actual revenue received, and (3) in including certain subtransmission line losses in I&M's costs. We affirm the Commission's resolu-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

1. Pursuant to the Department of Energy Organization Act, Pub.L. No. 95–91, 91 Stat. 565, 42 U.S.C. §§ 7171, 7172, 7176 (August 4, 1977), Congress replaced, effective October 1, 1977, the Federal Power Commission with the Federal Energy Regulatory Commission. Thus, since this appeal involves agency action taken both before and after the reorganization, the generic term "Commission" is used to refer to the appropriate regulatory body.

2. The municipalities involved in this appeal are the Cities of Anderson and Auburn, Indiana, and the twelve municipal corporations that comprise the membership of the Indiana and Michigan Municipal Distributors Association.

Henceforth they are referred to as "petitioners."

3. 16 U.S.C. §§ 824d(d) & (e).

4. On June 22, 1978, I&M filed a superseding rate application with the Commission, which took effect on December 23, 1978. Thus the rate proceedings at issue in this appeal concern the locked-in period from July 23, 1976 through December 23, 1978.

5. FERC Opinion No. 79 (March 18, 1980). The only disagreement between the Commission and the administrative law judge relevant to this appeal involves the issue of purchase-power expense discussed *infra*.

6. FERC Opinion No. 79–A (May 16, 1980).

tion of the first two issues and remand for clarification on the third.[7]

## I. PURCHASE POWER

I&M purchases, pursuant to a cost of service tariff, all of the power produced by its wholly-owned subsidiary, Indiana and Michigan Power Company (I&MP). The tariff provides both for complete reimbursement for I&MP's operating expenses and for a margin of return on the subsidiary's common equity. It is a portion of this equity component of I&M's purchase-power expense that is at issue.

On October 8, 1975, the Commission accepted, as an initial rate schedule,[8] a purchase-power agreement between I&M and its generating subsidiary. The agreement specified a twelve percent rate of return on I&MP's equity. In Opinion No. 27, dated September 15, 1978, the Commission determined that the twelve percent rate was excessive and fixed eleven percent as the lawful return on equity I&MP could receive from the date of the decision.[9] Thus, during most of the locked-in period at issue in I&M's rate hearing (July 26, 1976 through December 22, 1978), I&M paid an excessive amount to its subsidiary for power. On this, all agree. Further, no one contends

that the Commission erred in giving only prospective effect to its one percent reduction in I&MP's rate of return on equity. Rather, the cornerstone of the dispute arises from the Commission's decision below to apply its Opinion 27, prospective-only order in the context of I&M's rate hearing to prevent the indirect retroactivity that would result if I&M were not allowed to pass the one percent excess on to its customers during the locked-in period. As the Commission stated:

> Upon review of this matter, the Commission is unable to agree with the judge's decision. It is not disputed that IMP's initial rates in Docket No. ER76–5 were not subject to modification until September 15, 1978, the date of Opinion No. 27. Prior to that time IMP's filed rates were lawful rates under the statute. To allow I&M to recover only the lower Opinion No. 27 rates from its customers during the locked-in period (prior to September 15, 1978) has the practical effect of making the Opinion No. 27 rates applicable to the Cook plant sales in lieu of the initial rates accepted for filing and made effective in Docket No. ER76–5. The difference between the filed initial rates

---

7. We agree with the City of Anderson that "[s]ubtransmission line losses are compensable costs for [I&M] only where it is [I&M] that has suffered these line losses." Brief of Petitioners, Cities of Anderson and Auburn, at 33. Thus, line losses occurring either on the City of Anderson's own transmission lines or on the downside of I&M's meter are not I&M costs that can be allocated to the municipal class pursuant to the "rolled-in" method. Although the Commission's brief completely avoids this point and Opinion 79 does not address it, the Commission appeared to take the position at oral argument that the administrative law judge did not in fact include the City of Anderson's transmission line losses in I&M's cost base. Since petitioners continue to assert that the judge did include these line losses, and since the judge's opinion is unclear on this point, we remand to the Commission for a clarifying statement on this issue consistent with this opinion and with its position at oral argument.

8. *See* 18 C.F.R. § 35.12. The importance of the distinction between "initial" and "changed" rates is discussed below.

9. Since there was no appeal taken from Opinion 27, the decision to accept I&MP's rate filing as an initial rate filing (rather than consolidating parent and subsidiary for ratemaking purposes and viewing the rate as I&M's changed rate) is not before us. We note, however, the statement of this court in *Florida Power & Light Co. v. FERC*, 617 F.2d 809, 817 (D.C.Cir. 1980):

> We believe that in light of the Commission's continuing duty to guard against abusive practices, it proceeds on a reasoned basis when it redraws its lines between initial and changed rates so as to scrutinize these . . . schedules with its broader § 205(e) powers.

Thus, the Commission is not without means of preventing utilities from forming producing-arm subsidiaries to evade the Commission's refund and suspension powers.

We further note that the issue here is not one of double-billing (*i.e.* charging customers two separate rates of return on the same equity base). *See* record transcript at 4815.

and the Opinion No. 27 rates must be absorbed, under the judge's decision, either by IMP or I&M. In either case the effect is a retroactive reduction of the initial rates in Docket No. ER76–5.

FERC Opinion No. 79, at 4.

■ The Commission predicates the legitimacy of its decision to permit I&M to include the full twelve percent in its purchase-power expense on sections 205 and 206 of the Federal Power Act, 16 U.S.C. §§ 824d(d) & (e). Section 206 empowers the Commission to determine and to fix by order the "just and reasonable" rates of utilities falling within its jurisdiction. Section 206 places, however, a significant restriction on the Commission's regulatory power by providing that the just and reasonable rates set by the Commission are "to be *thereafter* observed and in force." Although Congress rendered this retroactive-ratemaking prohibition less significant by qualifying it with section 205(e), which authorizes the Commission to suspend the operation of any *changed* rate and to permit the proposed change to go into effect subject to refund, these suspension and refund powers apply only to changed rates and thus do not extend to I&MP's initial-rate filing. *See, e. g., Florida Power & Light Company v. FERC,* 617 F.2d 809 (D.C.Cir.1980); *Otter Tail Power v. FERC,* 583 F.2d 399 (8th Cir. 1978). As this court stated in *Florida Power & Light, supra,* at 812–13:

> Thus, the Act empowers the Commission to scrutinize, and if necessary to change, any rate filed, whether it is a changed rate or the first rate a utility has ever filed. However, only if the filed rate is a changed rate may the Commission also suspend its operation or allow it into effect subject to refund. It is the fact that the Commission has greater power over changed rates than it has over initial rates that lies at the heart of this suit.

Although petitioners do not dispute this basic statutory scheme, and thus concede that section 206 would bar the Commission from ordering I&MP to refund directly the one percent excess to I&M, they contend that, given the affiliated relationship involved, the "thereafter observed" limitation does not preclude the Commission from ordering I&M to refund the excess to its customers, since I&M's changed rates came into being subject to refund.

■ Courts afford great deference to agency constructions of the statutes they were created to administer. *See, e. g., Florida Power & Light, supra; Public Service Company of New Hampshire v. FERC,* 600 F.2d 944 (D.C.Cir.1979); *Otter Tail Power, supra; Gulf Oil Corporation v. FPC,* 563 F.2d 588 (3d Cir. 1977); *cf. Maine Public Service Company v. FPC,* 579 F.2d 659, 665 n.10 (1st Cir. 1978) (distinguishing between agency interpretation of judicial precedent and interpretation of the agency's own enabling statute). In order to reject the Commission's reading of section 206, we must find that its judgment "cannot be rationally reconciled with the terms of the Act." *Florida Power & Light, supra,* at 814; *Otter Tail Power, supra,* at 404. We find the Commission's reading of section 206 in accord with the statutory language and structure.[10] Congress simply chose not to permit retroactive ratemaking in the initial rate context and thus decided to permit electric utilities to retain the "unjust and unreasonable" portion of the initial rate collected prior to Commission action. From this statutory premise, it follows reasonably that once the Commission decided to accept, and all the parties acceded to, the classification of I&MP's rate as an initial rate, the Commission acted reasonably in following through with the consequences of that determination. Since petitioners cannot gainsay that factoring an eleven percent equity figure into I&M's purchase-power expense for the locked-in period would accomplish, in essence, a retroactive reduction in I&MP's initial rate schedule, we think it rational for the Commission to resolve that Congress did not intend it to elevate form over substance by distinguishing between direct and indirect retroactive ratemaking.

---

10. The legislative history surrounding the Federal Power Act of 1935 (S. 2796) gives no illumination of why Congress chose to limit the Commission's retroactive-ratemaking powers.

Petitioners' argument that section 206 does not bar the Commission from indirect retroactive ratemaking, if accepted, would, of course, largely eviscerate the "thereafter observed" limitation in the affiliated-company context. Thus a less circuitous means to the end sought would be to carve an exception to section 206, giving the Commission the authority to order refunds whenever fund transfers between affiliated companies were at issue. Although such an extension of Commission power might be wise legislation, our limited role is to determine whether the Commission interpreted and applied the statute in a rational way. Since section 206 on its face draws no distinction between affiliated and non-affiliated entities, and since petitioners have failed to show that Congress must have intended the distinction to be implicitly understood,[11] we must affirm the Commission's application of section 206, requiring the inclusion of the twelve percent figure in I&M's purchase-power expense.

## II. SHORT–TERM SALES

Pursuant to the applicable regulations,[12] I&M submitted, with its May 1976 rate application, actual cost of service data for Period I (1975) and projected ("test-year") cost of service data for Period II (1976). At issue is I&M's projected revenue from wholesale short-term sales.

I&M's test-year data included estimated revenue from short-term sales of approximately $44,900,000.[13] However, I&M's actual 1976 revenues from short-term sales amounted to $81,600,000. Despite this substantial disparity between projected and historical revenue figures, the administrative law judge used the former rather than the latter to calculate the amount of I&M's rate increase, since he found that the test-year figure was reasonable when made. The Commission affirmed this ruling without specific comment. Petitioners contend that the test-year figure should have been rejected as unreasonable when made.

In *American Public Power Association v. FPC*, 522 F.2d 142 (D.C.Cir.1975), this court upheld the Commission's use of test-year data in the ratemaking calculus. And to require routine revision of the estimates in light of actual developments would defeat the purpose of the test-year methodology. As the Seventh Circuit recently stated in *Indiana Municipal Electric Association v. FERC*, 629 F.2d 480, 483 (7th Cir. 1980):

> To require a reworking of a utility's estimated costs in light of subsequent actual costs not only would result in interminable delays in already lengthy rate proceedings but would encourage dilatoriness in challengers in the hope that history would spoil the utility's estimated cost

---

**11.** Petitioners do argue, however, that the Commission itself has fashioned a "no-profits-to-affiliates-rule" that takes precedence over the "thereafter observed" limitation of section 206. We disagree. The so-called "no-profits-to-affiliates-rule" is more descriptively labeled the "no-automatic-acceptance-of-prices-paid-to-affiliates-rule." As described by the Federal Power Commission:

> In view of these decisions [e. g. *Mississippi River Fuel Corp. v. FPC*, 252 F.2d 619 (D.C. Cir.1957)] it is entirely clear that we would be remiss in accepting Union's filed rates for United's purchased gas costs. The courts, in effect, place the filed rates of an affiliate in a different category than those of a non-affiliate. This follows reasonably because, as the court said, we are dealing with a single corporate structure. *We must therefore do something more than accept the filed rates, as United would have us*, but we are not required to include a full-blown inquiry into Union's rates in the present proceeding.

*United Gas Pipe Line Co.*, 31 F.P.C. 1180, 1187 (1964) (emphasis added). In this instance, however, the Commission *has* done "something more than accept the filed rates" of I&M and I&MP—it has determined the just and reasonable rates of both companies. Thus, we are not dealing with an indiscriminate acceptance of either I&M's cost or I&MP's prices. Rather, the problem in this case is what effect the Commission should give to its rejection of those costs and prices. The Commission determined, given the classification of I&MP's rate filing as an initial rate filing and given section 206's bar on retroactive revision of initial rates, that the effect should be prospective only. We find this a reasoned conclusion that is not contradicted by judicial or agency precedent.

**12.** *See* 18 C.F.R. § 35.13(b)(4)(iii).

**13.** This revenue estimate was based on sales of 2.9 million megawatt-hours at $1.55 per kilowatt-hour.

of service .... [I]f a utility always had to adjust its Period II projections because of actual experience ... the Commission would be forced to return to historic cost even though Congress did not so intend.

■ Thus, the Commission rightly does not require that history prove the accuracy of the utilities' estimates, but rather that the utility prove that the estimates were reasonable when made. *Id.; Public Service Company of Indiana,* F.P.C. Opinion No. 783–A (February 25, 1977). Once the utility has demonstrated the reasonableness of its estimates, the challenging party has the burden of showing that "subsequent events indicate that to use [the estimate] as a basis for future projections would yield unreasonable results." *Indiana Municipal Electric Association, supra,* at 485, *quoting Southern California Edison Company,* FERC Opinion No. 55, at 6 (August 1, 1979).

Petitioners contend that the revenue estimate was unreasonable when made [14] essentially because it unrealistically projected a decrease in short-term revenues from the preceding year when in fact short-term revenues had increased an average of thirty-two percent per annum over the last five years. The administrative law judge correctly noted, however, that these increases in revenues were due in part to substantial rate increases during these years. Thus, the judge chose instead to employ the following five-year table, measuring short-term sales by volume rather than dollar amounts:

| Year | Volume (Approximate in million mwh) |
|------|-------------------------------------|
| 1971 | 1.7 |
| 1972 | 2.3 |
| 1973 | 2.6 |
| 1974 | 2.2 |
| 1975 | 3.3 |

The judge discerned from this table a pattern of moderate annual increases in short-term sales with an anomalous decrease from 1973 to 1974 and an anomalous sharp increase from 1974 to 1975. Thus discounting the seemingly unusual 1975 figure, the judge reasoned that the company succeeded in establishing that its estimate was reasonable when made, since its projection of 2.9 million megawatt-hours for 1976 was not out of line with past experience, and since petitioners failed to show that I&M should have foreseen that the conditions underpinning the 1975 increase would persist into 1976.[15]

■ Petitioners argue, however, that the actual 1976 figures themselves belie the reasonableness of the estimate. This would

14. In their initial brief, petitioners Anderson and Auburn argued only that the estimate was unreasonable when made. (Petitioners IMDA did not brief this issue.) In their reply brief, they erroneously assumed that all they need to show to satisfy the second test is that the estimate was "substantially in error because of subsequent events which were not reasonably foreseeable at the time such estimates were developed." Reply Brief of Petitioners, Cities of Anderson and Auburn, at 15–16, *quoting Southern California Edison, supra,* at 5–6. In *Southern California Edison,* however, the Commission established that the touchstone, once the utility has established that its estimate was reasonable when made, is whether "subsequent events indicate that to use [the estimate] as a basis for future projections would yield unreasonable results." Opinion No. 55, at 6. Thus, challengers must go beyond establishing a substantial disparity between the test-year and historical figures. They must proceed to establish that the use of the estimate would yield, overall, an unreasonable result by showing, for example, that there were no offsetting considerations or that the causes underlying the increase in short-term sales could be expected to spill over into the remaining months covered by the rate increase. *See Indiana and Municipal Electric Ass'n, supra,* at 484. Since petitioners did not go beyond the fact of disparity to demonstrate that the overall rate decision was thereby rendered unreasonable, we address only their contention that the estimate was unreasonable when made.

15. The only evidence petitioners adduced on this point concerned the amount of reserve margin possessed by I&M. Their argument seems to be that since I&M knew at the time it made the estimate that it had a reserve margin in excess of forty percent (while twenty percent is considered average), it should have expected that a commensurate demand would arise to seek this supply. But the record indicates that other utilities in the area had also increased their generating capacity, *see* record transcript at 969–70, and there is nothing in the record beyond the historical revenue figures to indicate that I&M should have expected demand to match supply.

certainly be the case, if I&M were not able to attribute the actual sharp rise in 1976 sales to specific unforeseen causes. Since there is, however, substantial evidence in the record to indicate that the increased sales were the result of reasonably unforeseen causes,[16] we affirm the agency's use of the test-year estimate.

Accordingly, the Commission's decision is

*Affirmed in part and remanded in part.*

---

**16.** *See* record transcript at 543–45. Neighboring utilities' plant failures and an unusually severe winter were two important, unexpected causes leading to the increase in short-term revenues.

